**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



———————————————————————

In the matter of the Application of M.C. )
and J.B. on behalf of B.C., their minor )
child, )
)
                    **Plaintiffs,** )
)
        -against- )
)
)
**Rye Neck Union Free School District,** )
)
                    **Defendant.** )
———————————————————————)

06 cv. 3898 (CLB) (LMS)

~~06 Civ. 2114~~ (CLB) (LMS)

**REPORT AND**
**RECOMMENDATION**

**TO:    THE HONORABLE CHARLES L. BRIEANT**
**UNITED STATES DISTRICT JUDGE**

The parents ("Plaintiffs") of B.C., a child with a learning disability, commenced this

action on May 22, 2006, pursuant to the Individuals with Disabilities in Education Act ("IDEA"),

20 U.S.C. § 1415 (2000).[1] Docket entry 1. They seek to overturn the decision of the State

Review Officer ("SRO") denying their request for tuition reimbursement from Rye Neck Union

Free School District ("Defendant") for the placement of their son at the Windward School, which

---

[1] The IDEA was amended by the Individuals with Disabilities Education Improvement
Act of 2004 ("IDEIA"), Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), which took effect on
July 1, 2005. Because all events related to this case, except for the decisions of the Independent
Hearing Officer ("IHO") and the SRO, occurred prior to the IDEIA's effective date, all statutory
citations refer to the IDEA, as codified prior to the enactment of the IDEIA. See Lillbask v.
Conn. Dep't of Educ., 397 F.3d 77, 80 n.1 (2d Cir. 2005); see also Decision of State Review
Officer ("SRO Decision") at 11 n.1. Similarly, the applicable provisions of the Code of Federal
Regulations have recently been amended as well. The amendments became effective on October
30, 2007; however, the provisions in effect at the time that the relevant events took place will be
referenced herein.



1

Docket in case # 06-cv/cr 2114
As: Report + Recommendation
Date: 5/19/08    LMS/USMJ

is a private school in White Plains, New York, that exclusively educates disabled students, for the 2004-05 school year. Complaint at pages 16-17. Your Honor referred this case to me for all purposes on October 1, 2007. Docket entry 13. Defendant moved for summary judgment on December 13, 2007. Docket entries 16-19. Plaintiffs failed to respond to the motion, and the time to do so has now passed. After a review of the entire record and for the reasons stated below, I conclude, and respectfully recommend that Your Honor should conclude, that the SRO's decision should be upheld. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Defendant's motion for summary judgment should be granted.

## I.    BACKGROUND

### A.    Statutory Framework

The IDEA offers federal funds to states that develop plans to provide children with disabilities "a free appropriate public education," or a "FAPE." 20 U.S.C. § 1412(a)(1). Under the IDEA, a FAPE must include "special education and related services" tailored to meet the unique needs of each child, id. § 1401(8), and be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). Because the IDEA "expresses a strong preference for children with disabilities to be educated 'to the maximum extent appropriate,' together with their non-disabled peers," a FAPE must be provided to a child with disabilities in the "least restrictive setting consistent with the child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5)). New York defines the "least restrictive environment" as one that "(1) provides the special education needed by the student (2) to the maximum extent appropriate with other students who do not have handicapping conditions, and (3) is as proximate as possible to the

student's place of residence." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(cc)). "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." Walczak, 142 F.3d at 122.

The special education and related services required by the IDEA are delivered to a child with disabilities pursuant to an individualized education program ("IEP"), which is tailored to the individual needs of the child. 20 U.S.C. § 1414(d). An IEP is a written program of instruction developed for the child at least annually, id. § 1414(d)(4), by a "team" consisting of the local educational agency, the child's teacher, the child's parents or guardians, and, where appropriate, the child. Id. § 1414(d)(1)(B). In New York, the IEP Team is called the Committee on Special Education ("CSE"). N.Y. Educ. Law § 4402(1)(b)(1). Under the IDEA, an IEP must state, inter alia: (1) the child's present levels of educational performance; (2) a statement of measurable annual goals; and (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs. 20 U.S.C. § 1414(d)(1)(A). The IEP must be reviewed at least annually to determine whether the student is achieving the goals set out in the IEP. Id. § 1414(d)(4)(A).

In addition to the IEP, the IDEA provides "procedural safeguards" to ensure the provision of a FAPE. Id. § 1415(a). Specifically, the IDEA requires states to provide parents with "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." Id. § 1415(b)(6). "Whenever [such] a complaint has been received . . .,

3

the parents involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." Id. § 1415(f)(1). New York provides a two-tiered administrative review process in which complaints are first reviewed through a hearing conducted by a local hearing officer. See N.Y. Educ. Law. § 4404. A local hearing officer's decision may be appealed to the state review officer. Id. Any party still aggrieved after the decision of the state review officer may bring an Article 78 proceeding in state court or a federal action under the IDEA. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Thus, pursuant to these procedural safeguards, parents dissatisfied with a proposed IEP may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with the state educational agency challenging the appropriateness of the IEP and seeking reimbursement for the private school tuition from the school district. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005). In order to establish entitlement to reimbursement, the parents of a disabled child must establish two factors, called the Burlington factors: (1) that the District's IEP was inappropriate to meet their child's special needs and (2) that the parents' placement was appropriate.[2] See M.S. v. Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000); see also Burlington Sch.

---

[2] Until recently, the School District bore the burden of proof under the first Burlington factor to show the appropriateness of the contested IEP. However, on November 14, 2005, the Supreme Court held that the party requesting relief in IDEA cases, which is usually the parents of the disabled child, should bear the burden of proof for both Burlington factors. Schaffer v. Weast, 546 U.S. 49 (2005). Because the IHO issued his decision on October 31, 2005, he appropriately, though incorrectly, placed the burden of proof as to the adequacy of the disputed IEP on Defendant. In his January 24, 2006, decision, the SRO noted that his determination that Defendant offered a FAPE to B.C. for the 2004-05 school year would "remain if during the administrative hearing the burden had been placed on the parents, the parties challenging the IEP,

4

Comm. v. Dep't of Educ., 471 U.S. 359 (1985); Walczak, 142 F.3d at 129. "If parents meet their burden, the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." Gagliardo, 489 F.3d at 112.

**B.    Summary of Relevant Facts[3]**

B.C. was approximately eight years old and in second grade when Plaintiffs initiated the underlying proceedings. Defendant's 56.1 Statement at ¶ 1. At the time, B.C. had been diagnosed with a learning disability, attention deficit hyperactivity disorder ("ADHD"), sensory integration disorder, and developmental coordination disorder. SRO Decision at pages 1-2. B.C. had also been identified as having deficits in phonological awareness affecting his ability to retain information in order; visual perception affecting his discrimination, reading, and writing of letters and numbers; oral motor skills affecting his articulation; and fine motor skills affecting his writing. Id. at page 2.

When B.C. completed preschool, the Committee on Preschool Special Education ("CPSE") referred B.C. to Defendant's Committee on Special Education ("CSE"). Id. The CSE met on May 1, 2002, and determined that B.C. should be classified as having a speech or language

_____

as the Supreme Court recently established in Schaffer v. Weast, 126 S. Ct. 528, 537 (2005)." SRO Decision at page 11, n.3. In any event, I have reviewed the record as if the burden of proof rested with Plaintiffs, and I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs have not carried their burden. See e.g., Gagliardo, 418 F. Supp. 2d 559, 572 (S.D.N.Y. 2006), rev'd on other grounds, 489 F.3d 105 (2d Cir. 2007).

[3] The facts in this section are taken from: (1) the Complaint; (2) Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Defendant's Memorandum in Support") and its accompanying 56.1 Statement ("Defendant's 56.1 Statement"); (3) the Administrative Record, which includes the transcripts of the impartial due process hearing ("Tr"), the IHO and SRO Decisions, and the exhibits offered by Defendant ("Defendant's Exhibits") and Plaintiffs ("Plaintiffs' Exhibits"). The facts in this section are uncontested, unless otherwise noted.

impairment and that he should receive occupational and speech-language therapy. Id. B.C. began

kindergarten at the Daniel Warren Elementary School in the Defendant District in the fall of 2002.

Id.; Defendant's 56.1 Statement at ¶ 3. In January of 2003, B.C. was referred to the school's

instructional support team ("IST") because of academic, behavioral, and social issues.

Defendant's 56.1 Statement at ¶ 4. Specifically, B.C.'s kindergarten teacher reported that B.C. was

not progressing in the classroom, having difficulty acquiring basic skills and concepts, and

making minimal progress in occupational and speech therapy. SRO Decision at page 2. IST

recommended that a plan be developed for B.C.'s inappropriate behaviors, participation in a social

skill group, and additional testing. Id. IST met with Plaintiffs on February 4, 2003, to discuss

B.C.'s progress. Id. At or around the time of the meeting, Plaintiffs indicated that they were

having B.C. privately tested by the Center for Learning Disorders ("CLD") and would share the

results of the tests with the CSE. Id.; Defendant's 56.1 Statement at ¶ 4.

   In early 2003, CLD conducted a neurologic, educational, and psychological evaluation of

B.C. which suggested early signs of "specific learning disabilities," including inconsistencies in

attention span, reading and math skills, and discrimination between specific consonant and short

vowel sounds, as well as visual memory weakness. SRO Decision at pages 2-3; Defendant's 56.1

Statement at ¶ 5. The CLD educational evaluator recommended placement in a self-contained

class, occupational therapy, language therapy, additional instruction in phonemic awareness,

classroom management strategies to improve attention, multi-sensory reading instruction, a basal

reading program, and manipulatives for mathematics. SRO Decision at pages 2-3. In addition, in

April 2003, the CLD evaluators prepared their summary and recommendations, noting a forty-one

point difference between B.C.'s verbal and performance IQ scores, "definite signs of learning

disability," and behavioral difficulties. Id. The evaluators recommended that B.C. be provided

occupational therapy, language therapy, an Orton-Gillingham based reading program, and a social skills program. Id. at page 3.

On April 28, 2003, the CSE met to review B.C.'s program. Id.; Defendant's 56.1 Statement ¶ 5. At that time, the CSE reviewed the CLD reports. SRO Decision at page 3. Based on B.C.'s significant weaknesses in math and reading, the CSE changed the student's classification to learning disabled. Id.; Defendant's 56.1 Statement at ¶ 6. The CSE also recommended that B.C.'s program be changed to include consultant teacher services for intensive math support, participation in a multi-sensory reading program, counseling, and a continuation of the occupational and speech-language therapy that B.C. was already receiving. Id. The CSE agreed to reconvene in June of 2003 to plan for the 2003-04 school year, but began to implement the changes to B.C.'s program immediately. Defendant's 56.1 Statement at ¶ 7.

On June 23, 2003, the CSE conducted an annual review for B.C.'s kindergarten school year and to develop an IEP for the 2003-04 school year. SRO Decision at page 4; Defendant's 56.1 Statement at ¶ 8. At the review, B.C.'s kindergarten teacher, reading teacher, and speech-language therapist reported that B.C. had made progress on his goals and objectives in math, reading, writing, spelling, increased attention span, and behavior. Defendant's 56.1 Statement at ¶ 8. However, the CSE determined that B.C. should continue to be classified as learning disabled and recommended a twelve-month program to prevent "suspected regression." Id. at ¶ 9. The CSE also recommended that B.C. receive individual resource room services for intensive math support, that he participate in a multi-sensory reading program individually and in a small group, and that he receive individual occupational therapy, individual and small group speech-language therapy, and informal social skills group counseling. SRO Decision at page 4; Defendant's 56.1 Statement at ¶ 9. The CSE recommended that all of these services be provided on a non-

integrated or "pull-out" basis. SRO Decision at page 4. According to the 2003-04 IEP, Plaintiffs

attended the June 23, 2003, annual review and were in agreement with all of the CSE's

recommendations, including the frequency and location of the services. Joint Exhibit 39 at page

5.

Over the summer of 2003, B.C. made improvements in his visual perceptual and fine

motor skills, his planning and organization skills, his phonetic skills and learning of sight words,

and his writing and math skills. Defendant's 56.1 Statement at ¶ 10. However, when B.C. started

first grade in September 2003, B.C. behaved inappropriately over the course of a few days. SRO

Decision at page 4; Defendant's 56.1 Statement at ¶ 11. The school principal scheduled a meeting

with Plaintiffs to discuss a behavior plan and Plaintiffs agreed to allow B.C. to be observed by a

Board of Cooperative Educational Services ("BOCES") psychologist and consult with B.C.'s

teachers to develop a behavior plan. SRO Decision at page 4. Plaintiffs also consulted with a

CLD pediatric neurologist and B.C. was prescribed medication for ADHD. Id.; Defendant's 56.1

Statement at ¶ 13.

On November 12, 2003, the CSE reconvened to review B.C.'s progress. Id. at ¶ 14; SRO

Decision at page 5. B.C.'s teachers reported that B.C. had made significant improvements in his

behavior and social skills, as well as in reading, writing, spelling, speech and language skills, and

visual perceptual skills. SRO Decision at page 5. The CSE recommended that B.C. continue his

current program but, based on a request from B.C. and Plaintiffs, changed the frequency and ratio

of non-integrated services so that B.C. would receive more of his services with other students,

reducing the number of non-integrated services by one. Defendant's 56.1 Statement at ¶ 14. A

progress report prepared in December 2003 based on B.C.'s IEP goals and objectives indicated

that under the IEP, B.C. was "progressing satisfactorily" or "showing some progress" toward

meeting his reading goals, "showing some progress" toward meeting his writing goals, was either "progressing satisfactorily" or "showing some progress" toward meeting his mathematics goal, and was either "progressing satisfactorily" or "showing some progress" toward meeting most of his occupational speech-language therapy goals. SRO Decision at page 5; Joint Exhibit 32.

On March 17, 2004, Plaintiffs requested an early annual review. Defendant's 56.1 Statement at ¶ 15. On March 29, 2004, the CSE reconvened to review B.C.'s progress. Id. at ¶ 16; SRO Decision at page 6. The CSE noted steady progress in all areas. Defendant's 56.1 Statement at ¶ 16. No changes were made to B.C.'s program at that time, despite Plaintiffs' indication that they would like the number of non-integrated services to be reduced for the 2004-05 school year. SRO Decision at page 6.

On May 3, 2004, the CSE reconvened for the annual review of B.C.'s program and to develop an IEP for the 2004-05 school year. Id.; Defendant's 56.1 Statement at ¶ 18. The CSE noted that based on teacher input and testing results, B.C. had shown progress across all academic and social areas. SRO Decision at page 6; Defendant's 56.1 Statement at ¶ 19. Specifically, end-of-year testing documented progress in phonemic awareness, math, reading, sensory and visual processing skills, and fine motor skills. SRO Decision at page 6. As a result, the CSE recommended that B.C. continue with an extended school year program during the summer of 2004 that included consultant teacher services to support B.C.'s math and reading skills. Id. For the 2004-05 school year, the CSE recommended group consultant teacher services for math and writing twice a week on an integrated basis and twice a week on a non-integrated basis, indirect consultant teacher services once per week, non-integrated reading instruction once a week, and reading consultation bimonthly with the classroom teacher, and group occupational and speech language therapy once a week on an integrated basis and once a week on a non-integrated basis.

Id.; Defendant's 56.1 Statement at ¶ 20. The CSE also recommended group occupational and speech language therapy once per week on an integrated basis and once a week on a non-integrated basis. SRO Decision at page 6; Defendant's 56.1 Statement at ¶ 20. Finally, the CSE recommended that a review meeting be held in November 2004 to assess the programming. SRO Decision at page 6. Thus, the CSE reduced the number of non-integrated services by five and replaced four of them with integrated services, thereby reducing out-of-class time in reading, math, speech and language, and occupational therapy for the 2004-05 IEP. Defendant's 56.1 Statement at ¶ 21.

On May 25, 2004, one of the Plaintiffs met with District Administrator of Special Services, Diane Santangelo ("Ms. Santangelo"), and School Psychologist, Michelle Sodine ("Ms. Sodine"), to discuss Plaintiffs' remaining concerns. SRO Decision at page 7; Defendant's 56.1 Statement at ¶ 22. By letter dated June 3, 2004, B.C.'s mother informed the school that she had reviewed the 2004-05 IEP and, contrary to the statement in the IEP that she and her husband agreed with the plan, Plaintiffs did not agree with the plan and requested more integrated time and less non-integrated services than the previous year. SRO Decision at page 7; Defendant's 56.1 Statement at ¶ 23. B.C.'s mother also requested that someone be placed in B.C.'s regular education classes to make sure that he understood the teacher's directions and was writing coherently. SRO Decision at page 7.

In response to the letter, Ms. Santangelo and Ms. Sodine met with Plaintiffs on June 22, 2004. SRO Decision at page 7; Defendant's 56.1 Statement at ¶ 24. At that time, Plaintiffs indicated that B.C. had been accepted to Windward and that they were seriously considering the option. Id. On June 25, 2004, Plaintiffs met with the individuals who would be providing

services to B.C. for the 2004-05 school year. SRO Decision at page 7; Defendant's 56.1 Statement at ¶ 25. The staff agreed that services in math and occupational and speech and language therapy could be provided on an integrated basis, but concluded that the reading program needed to remain non-integrated. Id. Plaintiffs and the staff also agreed to revisit the need for non-integrated services in the middle of the school year. Id. However, after the meeting, Plaintiffs sent Ms. Santangelo a letter dated June 25, 2004, stating that they had decided to enroll B.C. in Windward and would be seeking reimbursement for tuition and transportation expenses. SRO Decision at page 7; Defendant's 56.1 Statement at ¶ 26.

### C. **Procedural History**

#### 1) *Independent Hearing*

By letter dated September 13, 2004, Plaintiffs requested an impartial hearing challenging the appropriateness of the 2004-05 IEP and seeking tuition reimbursement. SRO Decision at page 7. The hearing, conducted by an independent hearing officer, commenced on April 6, 2005, and continued on April 8, 2005, April 26, 2005, and June 22, 2005. IHO Decision at page 1. At the hearing, Ms. Santangelo; Cynthia Olstein ("Ms. Olstein"), the reading teacher at the District's Daniel Warren Elementary School ("Daniel Warren"); Ms. Sodine; Mary Rogers ("Ms. Rogers"), the reading teacher at the District's Bellows Elementary School; Valerie Feit ("Ms. Feit"), the District's SEM coordinator; Joan Babcock ("Ms. Babcock"), the principal of Daniel Warren; Gretchen Oakes ("Ms. Oakes"), B.C.'s first grade teacher; Laura Barrett ("Ms. Barrett"), a special education teacher; and Monique Santoro ("Ms. Santoro"), B.C.'s kindergarten teacher, testified on behalf of the School District. Tr: 56-443, 987-1139. Dr. Richard Sullivan, a private-practice psychologist and a partner in the Center for Learning Disabilities, and J.B., B.C.'s mother, testified

11

on behalf of Plaintiffs. Tr: 505-785.

After hearing the testimony and reviewing the documentary evidence submitted by the parties, the IHO concluded in a twenty-three page, double-spaced, decision that the 2004-05 IEP was both procedurally and substantively adequate under the first Burlington factor, and therefore did not consider whether Windward was an appropriate placement for B.C. or whether equitable considerations favored reimbursement. See generally IHO Decision. Specifically, the IHO found that Plaintiffs' arguments regarding the procedural adequacy of the IEP were without merit. IHO Decision at pages 17-20. First, the IHO noted that the CSE considered all appropriate reports and evaluations. Id. at page 17. Next, the IHO pointed out that contrary to Plaintiffs' claim, the CSE gave Plaintiffs a full opportunity to participate in the creation of the IEP and did not ignore their concern about the number of non-integrated services in the IEP. Id. at 17-18. In support of this conclusion, the IHO pointed out that the CSE acted at least partially on Plaintiffs' request to reduce the number of non-integrated services by reducing the number of non-integrated services by five for the 2004-05 school year. Id. The IHO also pointed out that because "[p]arents are equal members of a collaborative CSE team" and "hold no more authority or weight than . . . other CSE members," "their preference does not compel the CSE to recommend the Parents' preferred program or level of services . . . or the conclusion that the Parents' concerns and input were ignored." Id. at 18 (citing, inter alia, Straube v. Florida UFSD, 801 F. Supp. 1164, 1175-1178 (S.D.N.Y. 1992)).

Additionally, the IHO found that the evidence in the record did not support Plaintiffs' claim that the CSE refused to consider an alternate placement. Id. at pages 18-19. The IHO pointed out that the CSE utilized a March 2003 report by Dr. Janet Brain and an April 2003,

12

report by Dr. Sullivan that recommended a self-contained education class for B.C., but concluded that B.C. did not need special education placement because he had made progress under the 2003-04 IEP and could continue that progress under the 2004-05 IEP. Id.

The IHO also found that the CSE's alleged failure to include short-term objectives did not render the IEP procedurally inadequate. Id. at 19-20. The IHO pointed out that although the CSE could have been more exact with regard to the dates on which the short-term objectives would be evaluated, the CSE scheduled a meeting in November 2003 to measure B.C.'s progress and the CSE had discussed goals and objectives at the May 2004 meeting. Id. at page 20. Thus, the IHO concluded that the IEP was procedurally adequate. Id.

Finally, the IHO found no merit in Plaintiffs' claim that the IEP was substantively inappropriate because it mirrored the 2003-04 IEP. Id. at pages 20-22. The IHO pointed out that although Plaintiffs claimed that B.C. had only made trivial progress under the 2003-04 IEP, the testimony at the hearing and the written reports and evaluations received into evidence revealed that B.C. had made substantial progress under the prior IEP. Id. Accordingly, the IHO concluded that B.C. had received substantial educational benefits under the prior IEP and therefore, that the 2004-05 IEP was appropriate. Id. The IEP also noted that the District was legally obligated to place B.C. in the least restrictive environment and had fulfilled that obligation by placing him in a general education class, rather than a special education class. Id. at 22.

### 2) *Plaintiffs' Appeal to the SRO*

After the IHO issued his decision, Plaintiffs submitted an appeal from the IHO's decision to the SRO. Decision of State Review Officer ("SRO Decision") at page 1. On appeal, Plaintiffs made five arguments in support of their claim that the 2004-05 IEP was not appropriate: (1) the

13

2004-05 IEP did not contain sufficient short-term instructional objectives, (2) the 2004-05 IEP

was not substantively adequate because it mirrored the 2003-04 IEP, (3) the CSE failed to take

into account the emotional toll on B.C. of being repeatedly pulled out of the general education

classroom for non-integrated services, (4) the CSE failed to include Plaintiffs as active

participants in the creation of the 2004-05 IEP, and (5) the CSE ignored the CLD's

recommendation for the placement of B.C. in a self-contained special education classroom. See

generally SRO Decision.

In a detailed, eleven-page, single-spaced opinion, the SRO denied Plaintiffs' appeal,

finding that the 2004-05 IEP provided B.C. with a FAPE. Id. at page 11. First, the SRO agreed

with the IHO that although the CSE failed to include exact dates for short-term objectives, such

failure was not sufficient to render the IEP invalid because a meeting had been scheduled for

November 2004 to review the objectives. Id. at page 9. The SRO pointed out that in addition to

providing for the November 2004 meeting, the IEP also provided that written reports indicating

B.C.'s progress towards meeting the annual goals were to be provided three times during the year.

Id. The SRO also noted that during the 2003-04 school year, written reports and report cards had

been provided three times, the CSE had met twice to review B.C.'s progress, and the service

providers had completed several progress reports. Id.

The SRO also agreed with the IHO that although the 2004-05 IEP was similar to the 2003-

04 IEP, B.C.'s progress under the 2003-04 IEP was not trivial, as Plaintiffs' claimed. Id. at pages

9-10. Specifically, the SRO pointed to B.C.'s expanded sight word vocabulary and his ability to

consistently recognize and decode all initial and final consonant sounds except "b" and "d,"

recognize all consonant-vowel-consonant ("CVC") words, distinguish short vowel sounds in CVC

14

words most of the time, spell CVC words, solve addition and subtraction problems with combinations up to ten, interpret information on a picture graph, identify the tens and ones place of numbers, discriminate sounds, identify and recall story elements, write from dictation, and communicate and interact in a socially acceptable manner with his peers as substantial improvement from his status in early 2002. Id. at page 10. The SRO concluded that "based on a review of [B.C's] progress reports, standardized test scores, and testimony," B.C. had "made meaningful progress in the program implemented during the 2003-04 school year" and that therefore, because the 2004-05 IEP was similar to the 2003-04 IEP, the 2004-05 IEP was "reasonably calculated to enable [B.C.] to receive educational benefits." Id.

Next, the SRO found that Plaintiffs' claim that the CSE failed to take into account the emotional toll on B.C. from being pulled out of class for non-integrated services to be without merit. Id. at pages 10-11. The SRO pointed to the fact that the CSE had responded to Plaintiffs' concern about the number of non-integrated services by reducing the number of such services for the 2004-05 school year. Id. The SRO also pointed out that, according to the testimony at the hearing, B.C. had shown resistence to leaving the classroom at the beginning of the year, which was typical of students his age, but that B.C.'s resistence lessened over the course of the year. Id.

Additionally, the SRO found that, contrary to Plaintiffs' argument, Plaintiffs were afforded a full opportunity to participate in the formation of the 2004-05 IEP. Id. at page 11. Specifically, the SRO pointed out that Plaintiffs participated in three CSE meetings during the 2003-04 school year between November 2003 and May 2004 and also met with the administrator after the 2004-05 IEP was developed to discuss remaining concerns. Id.

Finally, the SRO found that the CSE did not ignore the CLD's recommendation that B.C.

be placed in a self-contained classroom. Id. The SRO noted that the record showed that the CSE considered the CLD evaluations and even made recommendations consistent with several of the CLD's recommendations. Id. Thus, the SRO concluded that none of Plaintiffs' arguments had merit sufficient to render the 2004-05 IEP inappropriate. Id. Because the SRO made this conclusion, the SRO did not address whether or not Windward was an appropriate placement for B.C. or whether equitable considerations weighed in favor of granting Plaintiffs reimbursement. Id.

### 3) *Proceedings in this Court*

Plaintiffs brought this action, appealing the SRO's decision, on March 17, 2006. Docket entry 1. After the parties conducted some discovery in the case, on December 13, 2007, Defendant moved for summary judgment. Docket entries 16-19. Defendant argues that the SRO's decision should be upheld because the IEP at issue was both procedurally and substantively adequate. See generally Defendant's Memorandum in Support.

Although Plaintiffs did not submit an opposition to Defendant's motion for summary judgment, the Complaint contains the same five arguments that Plaintiff raised before the IHO and the SRO in support of their claim that the 2004-05 IEP was inadequate: (1) the 2004-05 IEP did not contain sufficient short-term objectives, (2) the 2004-05 IEP was not substantively adequate because it mirrored the 2003-04 IEP, (3) the CSE failed to take into account the emotional toll on their son of being repeatedly pulled out of the general education classroom for non-integrated services, (4) the CSE failed to include Plaintiffs as active participants in the creation of the 2004-05 IEP, and (5) the CSE ignored the CLD's recommendation for the placement of B.C. in a self-contained special education classroom. Complaint at ¶¶ 24-35. As the

IHO noted, the first, third, fourth, and fifth arguments are challenges to the procedural appropriateness of the 2004-05 IEP and the second argument is a challenge to its substantive validity.

In the Complaint, Plaintiffs go on to allege that Windward is an appropriate placement for B.C. Id. at ¶¶ 36-54. Plaintiffs point out that Windward utilizes a specialized, language-intensive curriculum, small class settings, and highly trained teachers to educate learning disabled students in a warm, supportive environment that fosters self-reliance and confidence. Id. Plaintiffs also point out that Windward uses the Orton-Gillingham method of teaching reading, writing, and spelling and that under that program, B.C.'s progress reports and report cards show that B.C. has made meaningful progress. Id. at ¶ 41. Furthermore, Plaintiffs point out that Dr. Sullivan testified that B.C. had also made significant social and behavioral progress. Id. at ¶ 52.

## II. DISCUSSION

### A. Standard of Review

Summary judgment serves as a " 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in the IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." Lillbask, 397 F.3d at 83 n.3 (quoting Wharton v. New Fairfield Bd. of Educ., 217 F. Supp. 261, 270 (D. Conn. 2002)). However, unlike a typical motion for summary judgment, the inquiry in an IDEA action " 'is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed.' " Antonaccio v. Bd. of Educ., 281 F. Supp. 2d 710, 714 (S.D.N.Y.

17

2003). Indeed, the IDEA summary judgment procedure has been characterized as an appeal from an administrative determination. Lillbask, 397 F.3d at 83 n.3.

Although a district court's review of an IDEA petition is an independent review and the standard to be applied is the "preponderance of the evidence," the Supreme Court has warned that the review to be conducted "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." Rowley, 458 U.S. at 206. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206). "Deference is particularly appropriate when, as here, the SRO's review has been thorough and careful." Id.

**B.    Burlington Factors**

As noted supra, in order to determine whether the Plaintiffs are entitled to reimbursement for the unilateral parental placement of B.C. at Windward, the Court must address the two Burlington factors. Cerra, 427 F.3d at 192. A school district may be required to pay for educational services obtained for a child by his or her parent if: (1) the services offered by the board of education were inadequate or inappropriate, and (2) the services selected by the parent were appropriate. M.S., 231 F.3d at 102.

Under the first Burlington factor, "[t]wo issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was substantively appropriate, or 'reasonably calculated to enable the child to receive educational benefits.' " Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S.

at 206-07).

### 1) *Procedural Review*

"The initial procedural inquiry is no mere formality." Id. Compliance with the procedures set forth in the IDEA is critical to ensure that the educational needs of a disabled child are met. Rowley, 458 U.S. at 206. However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003). An IEP is deemed legally inadequate based on a procedural error only when the procedural error "depriv[es] a student of his [or her] right to a 'free appropriate public education.' " Id.

As stated supra, one of Plaintiffs' arguments is that the 2004-05 IEP was procedurally inadequate because it did not contain adequate short-term objectives. Complaint at ¶ 25. Under the IDEA, an IEP must include "a statement of measurable annual goals, including benchmarks or short-term objectives, related to . . . meeting the child's . . . needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum and meeting each of the child's other educational needs that result from the child's disability . . ." 20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.347. Benchmarks "describe[] the amount of progress the child is expected to make within specified segments of the year," while short-term objectives "generally break the skills described in the annual goal down into discrete components." 34 C.F.R. Part 300, Appendix A–Notice of Interpretation, Section I, Question I. "The purpose of both [short-term objectives and benchmarks] is to enable the child's teacher(s), parents, and others involved in developing and implementing the child's IEP, to gauge, at intermediate times during the year, how well the child is progressing toward meeting the annual goal." Id. Indeed, the New York

19

regulations require that "[e]ach annual goal shall include the evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal during the period beginning with placement and ending with the next scheduled review by the committee." 8 N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii).

The 2004-05 IEP at issue includes broad goals for improvement in particular subject areas and under each broad goal, lists a number of objectives to be met by the end of the school year. See Joint Exhibit 20. For example, under the subject area of "Reading," the first goal states, "1. Demonstrate an improvement in word recognition and decoding skills necessary to read for information and understanding," and the first objective under that goal states, "1. Demonstrate ability to decode consonant digraphs with 80% mastery, evaluated by utilizing observation checklists, as assessed by the reading teacher, by June 15." Id. at page 6. Although the IEP does not give specific interim dates to assess each objective throughout the school year, the IEP states that progress towards meeting the goals would be measured by written reports three times during the school year. Id. Additionally, at the hearing, Ms. Santangelo stated that "the teachers [were to] use their own diagnostic measures to monitor [the] objectives." Tr: 119. Furthermore, as both the IHO and the SRO pointed out, Ms. Santangelo scheduled a November meeting to reconvene the CSE to assess the effectiveness of B.C.'s programming (see IHO Decision at page 20; SRO Decision at page 9; Tr: 119; Joint Exhibit 20 at page 1), and as the SRO pointed out, under the 2003-04 IEP, "written reports toward meeting the annual goals were provided in December, March, and June, report cards were distributed three times during the year, the CSE met in November 2003 and March 2004 to review the student's progress and service providers completed progress reports at various times throughout the school year . . . ." SRO Decision at page 9. In

light of the above findings, both the IHO and the SRO found the IEP's statement of short-term objectives adequate. Because "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers," Grim, 326 F.3d at 382, and the Court is required to give "due weight" to their conclusions, I conclude, and respectfully recommend that Your Honor should conclude, that the 2004-05 IEP sufficiently complies with the requirements of the IDEA concerning the inclusion of short-term objectives or benchmarks. Thus, I likewise conclude, and respectfully recommend that Your Honor should conclude, that Plaintiffs' first argument challenging the procedural adequacy of the 2004-05 IEP is without merit.

Regarding Plaintiffs' next argument concerning the procedural adequacy of the 2004-05 IEP–that the 2004-05 IEP was procedurally inadequate because the CSE failed to take into account the emotional toll of non-integrated services on B.C.–I conclude, and respectfully recommend that Your Honor should conclude, that such an argument is also without merit. As the IHO and the SRO pointed out, the record does not support Plaintiffs' claim that the CSE ignored their concern over the emotional toll of non-integrated classes on B.C. IHO Decision at pages 17-18; SRO Decision at pages 10-11. In fact, evidence in the record below establishes that the CSE was aware of Plaintiffs' concern about the number of non-integrated services and tried to alleviate that concern by reducing the number of non-integrated services in B.C.'s 2004-05 IEP. Specifically, the record reveals that Plaintiffs raised their concern at a March 29, 2004, Requested Review CSE meeting and that Ms. Santangelo was notified of Plaintiffs' concern by letter dated June 3, 2004. Joint Exhibit 11. In response to Plaintiffs' concern, Ms. Santangelo met with Plaintiffs on June 22, 2004. Id. The minutes of that meeting reflect that Ms. Santangelo told

Plaintiffs that the CSE had heard their concern at the March 29, 2004, meeting and that school officials would observe B.C. before the annual review, keeping in mind Plaintiffs' concern. Id. The minutes also reflect that at the May 3, 2004, Annual Review meeting, Ms. Santangelo "framed" the annual review with regard to Plaintiffs' concern. Id. Additionally, the record reflects that Plaintiffs met with B.C.'s service providers and it was agreed that all of B.C.'s services would be provided on an integrated basis except for his reading program. Joint Exhibit 10. Finally, Ms. Olstein, a reading specialist who worked with B.C., testified that B.C.'s reluctance to leave the general education class for his non-integrated services decreased over the 2003-04 school year. Tr: 305-306; see also Joint Exhibit 24 at page 7 (noting a "significant decrease in . . . tearfulness when pulled out for specialized instruction"). Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that the CSE gave adequate consideration to Plaintiffs' concern about the emotional toll of non-integrated services on B.C., and therefore, that the 2004-05 IEP cannot be deemed procedurally inadequate on that basis.

Similarly, Plaintiffs' argument that the 2004-05 IEP was procedurally inadequate because the CSE failed to include them as active participants in the CSE process also lacks merit. The IDEA requires, *inter alia*,

> an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1). In addition, federal regulations governing parental participation require that, "[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate . . . ." 34

C.F.R. § 300.345(a). A parent's active participation in CSE meetings has been deemed sufficient to fulfill the IDEA requirement that parents be given a meaningful opportunity to participate in the development of an IEP. Cerra, 427 F.3d at 192-93.

Here, Plaintiffs participated in several CSE meetings during B.C.'s enrollment in District schools. See Joint Exhibit 61 (2001-02 IEP) at page 3; Joint Exhibit 60 (2002-03 IEP) at page 3; Joint Exhibit 24 (2003-04 IEP) at page 5; Joint Exhibit 20 (2004-05 IEP) at page 5. The IEP for the 2003-04 school year notes that Plaintiffs "were in agreement with all services including frequency and location," and the IEP for the 2004-05 school year notes that Plaintiffs were "in agreement with the student's individualized education plan for next year, and have expressed their gratitude with the substantial progress that [B.C.] has made this school year," indicating that Plaintiffs were not merely present, but were active participants in the meetings. Joint Exhibit 24 at page 6; Joint Exhibit 20 at page 6. Furthermore, Plaintiffs participated in additional meetings held by the CSE to assess B.C.'s progress. See Exhibit 34 (November 13, 2003, meeting) and Joint Exhibit 54 (February 5, 2003, meeting). Finally, when Plaintiffs sent a letter expressing dissatisfaction with the 2004-05 IEP, the District responded by scheduling two meetings with Plaintiffs during the summer of 2004—one in which Ms. Sodine and Ms. Santangelo met with Plaintiffs, and another in which the staff that would be administering services to B.C. met with Plaintiffs. Joint Exhibits 10-11; Tr: 347-48.

The IHO and the SRO concluded that because of Plaintiffs' significant involvement in the development of B.C.'s IEPs and active participation in CSE meetings, Defendant did not fail to offer Plaintiffs a meaningful opportunity to participate in the development of B.C.'s IEP. IHO Decision at page 18; SRO Decision at page 11. Given the evidence in the record of Plaintiffs'

involvement in B.C.'s education and giving due weight to the administrative officers' conclusions, I conclude, and respectfully recommend that Your Honor should conclude, that Defendant did not deprive Plaintiffs of a meaningful opportunity to participate in the development of B.C.'s IEP.

Finally, I also conclude, and respectfully recommend that Your Honor should conclude, that Plaintiffs' last argument challenging the procedural adequacy of the 2004-05 IEP is also without merit. Plaintiffs argue that the CSE did not consider the CLD's recommendation that B.C. be placed in a self-contained class for students with learning disabilities, yet the record does not support their contention. Complaint at ¶ 31. First, as noted by the IHO and the SRO, the CSE reviewed the evaluations and recommendations of the CLD doctors. IHO Decision at pages 18-19; SRO Decision at page 11. In fact, as the SRO pointed out, although the CSE is not required to consider the results of privately obtained evaluations, SRO Report at page 11(citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(g)(1)(v)(a)), several of the CSE's recommendations were consistent with a number of the CLD's recommendations. Compare Joint Exhibit 51 at pages 14-16 with Joint Exhibit 20 at page 6 (both recommend occupational therapy, speech/language therapy, and use of the Preventing Academic Failure program).

Moreover, it is important to note that despite the CLD's recommendation that B.C. be placed in a self-contained classroom, the IDEA "expresses a strong preference for children with disabilities to be educated 'to the maximum extent appropriate' together with their non-disabled peers." Walczak, 142 F.3d at 122. Accordingly, school districts have a legal obligation to provide FAPEs to their students in the least restrictive environment. Id. Thus, "only when the 'nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated."

24

Id. Here, the CSE considered the CLD's recommendation, but concluded that it could provide a

FAPE to B.C. by providing him with special education services and, for most subjects, keeping

him with his peers in the general education classroom. Joint Exhibits 10 and 20. Thus, I

conclude, and respectfully recommend that Your Honor should conclude, that the 2004-05 IEP

cannot be deemed procedurally inadequate based on the CSE's refusal to adopt the CLD's

recommendation that B.C. be placed in a self-contained special education classroom.

### 2) *Substantive Review*

In addition to establishing that the contested IEP was procedurally inadequate, IDEA

plaintiffs are also required to show that the contested IEP was substantively inadequate, or not

"reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at

207. On the one hand, this requirement does not mandate that the school district " 'maximize the

potential of [the disabled child].' " Walczak, 142 F.3d at 130 (quoting Rowley, 458 U.S. at 197

n.21). Indeed, the IDEA "does not require a school district to provide 'everything that might be

thought desirable by loving parents.' " Antonaccio, 281 F. Supp. 2d at 726 (quoting Tucker v. Bay

Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989)). "The purpose of the [IDEA] was

'more to open the door of public education to handicapped children on appropriate terms than to

guarantee any particular level of education once inside.' " Walczak, 142 F.3d at 130 (quoting

Rowley, 458 U.S. at 192). On the other hand, a child does not receive a FAPE when his or her

IEP provides opportunity for only trivial advancement. Id. "An appropriate public education

under [the] IDEA is one that is 'likely to produce progress, not regression.' " Id. (quoting

Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir. 1997)).

In order to determine if an IEP was reasonably calculated to provide educational benefits,

courts have looked to "objective evidence," such as test scores, passing grades, and advancement from grade to grade as indications of progress. Walczak, 142 F.3d at 130. Indeed, in Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114 (2d Cir. 1997), the Second Circuit affirmed the district court's reliance on a student's failure to achieve most of her IEP goals, low grades, and advancement of only one grade in three years, to find an IEP substantively inadequate. Id. at 1121. In assessing progress, deference to the SRO's decision is particularly important because state administrative agencies have special expertise in determining a student's progress. Cerra, 427 F.3d at 195.

Here, contrary to Plaintiffs' claim that the 2004-05 IEP was substantively inadequate because it was similar to the 2003-04 IEP, which, according to Plaintiffs, yielded only trivial progress, the SRO concluded that the 2004-05 IEP was substantively adequate. SRO Decision at page 10. I conclude, and respectfully recommend that Your Honor should conclude, that the SRO's finding was correct. First, as the SRO pointed out, B.C. made substantial progress, not trivial progress as Plaintiffs claim, under the 2003-04 IEP. Notably, in a Reading Progress Report dated November 12, 2003, Ms. Olstein noted that "[B.C.] has made growth in his reading, writing, and spelling skills since September," and that B.C. "had improved his handwriting." Joint Exhibit 31. In a November 2003 Speech and Language Progress Note, B.C.'s classroom teacher, Ms. Oakes, noted that "[s]ince the beginning of the school year, [B.C.] has made steady progress in his discrimination of sounds, verbal memory and ability to recall and complete longer directives." Joint Exhibit 30. In a March 2004 Speech and Language Progress Report, B.C.'s speech-language pathologist noted that B.C. had "shown improvements in all areas." Joint Exhibit 29. In an April 2004 Occupational Therapy Evaluation, the occupational therapist reported that B.C. had "made

excellent gains with sensory and visual processing." Joint Exhibit 23. Additionally, according to the Progress Report for the annual goals and objectives in the 2003-04 IEP, B.C. was reported to have made "some progress", to be "progressing satisfactorily," or to have "completed" all of his short-term objectives. Joint Exhibit 32. In all but one of the short-term objectives, B.C. received progressively better marks for each of the three reporting periods. Id. For the one objective in which B.C. did not receive a progressively better mark, B.C. maintained a "progressing satisfactorily" mark throughout the year. Id.

Furthermore, at the hearing, Ms. Santangelo testified that B.C. had made "substantial improvements" during the six week period after the start of B.C.'s services. Tr: 73-74. Ms. Olstein testified that "[t]hroughout the year, [B.C.] built upon the previously learned material and was able to make more and more words," and although "his progress was . . . slow[,] . . . he was definitely progressing through the material." Tr: 276. Ms. Olstein further testified that she measured B.C.'s progress using standardized tests, classroom assessments, and Preventing Academic Failure proficiency tests, and that B.C. was "definitely making good progress." Tr: 278-281. Specifically, Ms. Olstein testified that B.C. made "significant progress" in letter/word identification, "good progress" in the letter identification subset, and "progress" in other areas. Tr: 281-82. Ms. Sodine testified that B.C. made "substantial progress" and "measurable progress in all areas" under the 2003-04 IEP. Tr: 347. In addition to the documentary and testimonial evidence of B.C.'s progress under 2003-04 IEP, it should also be noted that B.C. progressed from first grade to second grade under the 2003-04 IEP. Joint Exhibit 20.

Thus, in light of the objective evidence of B.C.'s promotion to second grade, IEP short-term objective accomplishments, and the testimony of B.C.'s teachers and other staff, and giving

due weight to the SRO's conclusion, I conclude, and respectfully recommend that Your Honor

should conclude, that because the 2004-05 IEP mirrored the 2003-04 IEP and B.C. demonstrated

significant progress under the 2003-04 IEP, the 2004-05 IEP was reasonably calculated to afford

B.C. educational benefit and was therefore substantively adequate to provide B.C. with a FAPE

under the IDEA. Because Plaintiffs have not carried their burden of showing the

inappropriateness of Defendant's IEP, I further conclude, and respectfully recommend that Your

Honor should conclude, that the appropriateness of Plaintiffs' unilateral placement of B.C. at

Windward and any equitable considerations weighing in Plaintiffs' favor need not be addressed.

See, e.g., Cerra, 427 F.3d at 192.

**III.    CONCLUSION**

For the foregoing reasons, I conclude and respectfully recommend that Your Honor should

conclude, that Defendant appropriately addressed B.C.'s needs and formulated an IEP that was

reasonably calculated to confer educational benefit on B.C. Accordingly, I conclude, and

respectfully recommend that Your Honor should conclude, that Defendant's motion for summary

judgment should be granted.

**VI.    NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall

have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a total of

thirteen (13) working days from the date hereof, to file written objections to this Report and

Recommendation. See Fed. R. Civ. P. 6(a). Such objections, if any, shall be filed with the Clerk

of the Court, with extra copies delivered to the chambers of The Honorable Charles L. Brieant,

United States Courthouse, Southern District of New York, 300 Quarropas Street, White Plains,

New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Brieant.

Dated: _May 19, 2008_
White Plains, New York

Respectfully Submitted,

LISA MARGARET SMITH
United States Magistrate Judge

Copies of the foregoing Report and Recommendation have been sent to the following:
Charles L. Brieant, U.S.D.J.